

FILED

August 3, 2017

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

Time 10:15 AM

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| CONSUELO WILLIAMS, | ) | Docket No. 2016-07-0545 |
| Employee, | ) | |
| v. | ) | |
| CECO DOOR PRODUCTS, | ) | State File No. 17425-2015 |
| Employer, | ) | |
| And | ) | |
| TRAVELERS INDEMNITY INS. CO., | ) | Judge Amber E. Luttrell |
| Insurance Carrier. | ) | |

## COMPENSATION HEARING ORDER

This matter came before the undersigned Workers' Compensation Judge on June 22, 2017, for a Compensation Hearing. The parties stipulated Ms. Williams sustained a compensable injury to her left knee on March 2, 2015. The parties presented competing impairment ratings from Dr. Douglas Haltom, the authorized treating physician, and Dr. Samuel Chung, Ms. Williams' evaluating physician. The central legal issue is whether Ms. Williams successfully rebutted the presumption of correctness afforded Dr. Haltom's permanent impairment rating.[1] The secondary issue is whether Ms. Williams is entitled to discretionary costs. For the reasons set forth below, the Court holds Ms. Williams rebutted the presumption of correctness of Dr. Haltom's rating and awards Ms. Williams six-percent permanent partial disability to the body as a whole. Additionally, the Court holds Ms. Williams is entitled to discretionary costs.

### History of Claim

Ms. Williams works for Ceco Door Products as a production technician. Her job duties include driving a forklift, stacking doors, and performing computer work. On March 2, 2015, Ms. Williams injured her left knee at work when she tripped over a rail on the floor, fell, and struck her knee on the edge of a door, dislocating her patella. She

---

[1] The parties stipulated to pertinent findings of fact in the Appendix of this Order and more fully set forth in the parties' Joint Pre-Compensation Hearing Statement included as Exhibit 6 in the Technical Record.

1

received emergency care the same day and was referred for orthopedic evaluation. She received authorized orthopedic treatment from Dr. Douglas Haltom, whom she selected from a panel. She later underwent an independent medical evaluation by Dr. Samuel Chung. The parties took both physicians' depositions and introduced the following medical proof at the hearing.

*Medical Treatment and Physicians' Testimony*

### a. Dr. Haltom

Ms. Williams first saw Dr. Haltom on March 6, 2015, and complained of pain and swelling in her knee. Dr. Haltom noted significant examination findings and an X-ray indicated a significant tilt and almost subluxation of the patella. Dr. Haltom ordered an MRI, which revealed evidence of a transient patellar dislocation. He concluded, "Given her plain film findings and MRI findings of continued partial subluxation, her apprehension and her high risk of recurrent instability, I have recommended surgical intervention." (Ex. 3 at 4.)

On April 16, Dr. Haltom performed surgery on Ms. Williams' left knee. Dr. Haltom testified the surgery included a ligament reconstruction of the medial supporting ligament to support the patella and an osteotomy to correct anatomic malalignment, which made her more prone to episodes of patellar instability.

Ms. Williams continued seeing Dr. Haltom and began physical therapy. During her follow-up, Ms. Williams complained of functional weakness and pain in her knee, specifically with stairs. On June 16, Dr. Haltom noted a mild antalgic gait and quadriceps atrophy on examination but also excellent patellar stability. An X-ray indicated the osteotomy was consolidating, no evidence of hardware failure, and her patella was sitting centrally within her trochlear groove, which suggested the alignment was improved. Dr. Haltom continued Ms. Williams' restriction from the forklift at work and later noted her pain mostly resolved. He stated, "[S]he still complains of just some vague pain, but making daily improvements." (Ex. 3 at 20.) After six months of treatment and light-duty, Dr. Haltom returned Ms. Williams to full-duty work on September 25.

During her treatment, Ms. Williams continued working at Ceco on light-duty restrictions. Ms. Williams primarily performed seated work in the safety office. She testified she did not miss any work because Ceco did not want a lost-time accident. Ms. Williams was unable to drive; therefore, either her supervisors or family drove her to work each day.

Dr. Haltom last saw Ms. Williams on November 4, when she complained of continued mild weakness, particularly with steps and a mild ache-type pain. Dr. Haltom concluded she reached maximum medical improvement and indicated Ms. Williams

tolerated well the return to full-duty. Dr. Haltom noted no significant effusion in her knee with excellent patellar stability and tracking. As for her pain, Dr. Haltom explained, "Patellofemoral pain in general is an extremely complicated process, the articulation and mechanics of the patellofemoral joint, numerous pain generators . . . Ache pain can be from a variety of things postoperative, still postoperative pain . . . Hard to determine exactly the source of that ache pain." *Id.* at 29. According to Ms. Williams, Dr. Haltom informed her there was no further treatment left after surgery and therapy. He told her "it would take time."

In addressing permanent impairment, Dr. Haltom assigned a two-percent permanent impairment to the whole person. To calculate the impairment, he utilized the diagnosis-based impairment rating method and a diagnosis of patellar subluxation or dislocation listed in Table 16-3 (p. 510), placing her in Class 1. (Ex. 7, November 12 record.) Class 1 in Table 16-3 is defined as a "mild instability." Dr. Haltom assigned a grade modifier of 1 for her physical exam and a zero for her functional history, which resulted in a six-percent lower extremity impairment, which correlated to two-percent to the whole person.

Concerning Ms. Williams' allegations of knee buckling or "giving way" after her release, Dr. Haltom did not believe knee buckling indicated patellar instability per se. (Ex. 7 at 22-23.) Dr. Haltom further did not believe that Ms. Williams' quadriceps weakness, buckling, and difficulties with her knee at work as confirmed by her coworkers warranted a Class 2 "moderate instability" rating. Dr. Haltom stated, "She has some ongoing knee symptoms. That–that's fair to say. Correct." *Id.* at 32, 24. He acknowledged that he placed her in Class 1 for mild instability and stated that Ms. Williams' current symptoms could change some of her grade modifiers in Class 1, which would increase her rating. However, Dr. Haltom indicated, "[I]t would be difficult for me –without seeing her walk and assessing her, it would be difficult for me to accurately say." *Id.* at 33. Dr. Haltom maintained that he based his impairment rating on his last examination of Ms. Williams in November 2015 and would not personally know how she is doing now.

### b. Dr. Chung

Ms. Williams saw Dr. Chung for an independent medical evaluation (IME) on July 6, 2016. Dr. Chung reviewed Dr. Haltom's records and took a history from Ms. Williams. Ms. Williams reported ongoing difficulty climbing stairs, squatting, and entering and exiting the forklift at work. She further reported she was unable to run after this injury. On examination, Dr. Chung noted a positive patellar grind test of the left knee, patellar tracking problems, moderate instability of lateral movement and a moderate degree of lateral patella translation at twenty degrees on flexion. Dr. Chung further noted decreased range of motion, decreased muscle strength, and gross evidence of left quadriceps atrophy. Dr. Chung summarized his exam findings by stating Ms. Williams had "clear

3

positive findings on examination that showed that she still has long-term residual symptoms on her patella[.]" (Ex. 6 at 11.)

In addressing impairment, Dr. Chung assigned a six-percent permanent impairment rating to the whole person based on the same diagnosis selected by Dr. Haltom. However, Dr. Chung placed Ms. Williams in Class 2 for "moderate instability." To calculate the impairment, Dr. Chung assigned a grade modifier of 2 for functional history adjustment secondary to Ms. Williams' difficulty climbing stairs, squatting, and left quadriceps weakness. He did not apply the physical exam grade modifier adjustment because he defined the class based on her physical exam findings. Further, Dr. Chung did not utilize the clinical study grade modifier because he used the MRI study to confirm the diagnosis. He testified the overall net adjustment was zero, which resulted in the default sixteen-percent lower extremity rating for Class 2, which correlated to six percent to the whole person. Dr. Chung supported his Class 2 rating, stating, "Moderate instability is the class I used because . . . Patient had atrophy that was clearly visible. But beyond that, also, patient also had . . . positive findings on the patella grinding test and had moderate degree of instability in the lateral movement of the patella tracking." *Id.* at 15, 18.

Dr. Chung further explained why he thought Ms. Williams would not fit under Class 1, mild instability. He stated, "[N]ot only was she positive in patella grinding test, but she also was found to have a lateral movement and instability in the moderate degree. So, clearly, that's not mild, obviously." *Id.* at 18. He further cited the significant atrophy he observed with the weakness of the knee extensors and flexors.

*Hearing Testimony*

*a. Ms. Williams*

At the hearing, Ms. Williams; Reggie Adams, Ms. Williams' lead person at Ceco; and Tim Arnold, her supervisor, testified on her behalf.[2] Joe McMinn, Ceco's Safety Coordinator, testified at the hearing for Ceco.

Ms. Williams testified she experienced numerous knee difficulties since she returned to full-duty work. She stated her left knee is weaker and smaller than her right knee and it "gives way" or "buckles" approximately twice per month. She did not have this problem while treating with Dr. Haltom or during physical therapy because she was working light-duty at that time. She described her knee feeling "heavy" when she walks in safety shoes at Ceco. She further testified she cannot squat because her knee trembles and feels unstable. She takes over-the-counter pain medication. Ms. Williams also testified to significant difficulty entering and exiting the forklift and stated she must use

---

[2] The parties stipulated to the introduction of Mr. Adams' and Mr. Arnold's testimony into evidence by deposition in lieu of live testimony at the Compensation Hearing.

her arms and right leg to pull herself up.

Ms. Williams acknowledged she currently works full-time, including ten to fifteen hours of mandatory overtime per week. She continues to perform her pre-injury job but requires assistance stacking heavy doors. She stated Mr. Adams sometimes seeks assistance from another employee to help him lift a door if it is too heavy for her. Outside of work, Ms. Williams cannot bike, run, walk around her neighborhood, or bowl like she once did. She continues to go on cruises, but it hurts to walk on the beach and she cannot snorkel.

### b. Mr. Adams

Mr. Adams testified he has worked with Ms. Williams approximately fifteen years. In describing Ms. Williams' work duties, Mr. Adams testified one part of their job requires them to "palletize the doors," which means they must slide a door off the work-table onto another door. He estimated the doors weigh anywhere from seventy-five to 100 pounds. On average, they handle 200 to 250 doors per day. Mr. Adams stated Ms. Williams is unable to perform that job by herself and has difficulty with the doors.

Mr. Adams further testified Ms. Williams drives a forklift fifty to sixty percent of the time during her ten-hour shift. This requires her to climb on and off the forklift approximately 100 times per day. He corroborated Ms. Williams' testimony regarding her difficulty getting on and off the forklift and stated, "It's hard for her to get up and put weight on that knee to get up and down. And then when she gets off if it, she has to kind of slide off of it. She can't just step down like I can or anybody else." (Ex. 4 at 6.) Because of this difficulty, Ms. Williams is unable to drive a particular forklift that has a high lift due to knee pain.

Mr. Adams also testified Ms. Williams never exhibited any problems with her left leg prior to her work injury and always performed her job without any problems. Now, Mr. Adams stated Ms. Williams favors her left leg when walking and is unable to squat down completely. He further observed that her left knee tends to buckle. He stated, "I'll notice she'll kind of stumble a little bit or catch herself." *Id.* at 13. He further stated she almost fell a few times.

### c. Mr. Arnold

Mr. Arnold echoed Mr. Adams' testimony that he never observed any problems with Ms. Williams' left leg or knee prior to her work injury. Mr. Arnold stated he and Ms. Williams have discussed mutual problems with their knees buckling. Ms. Williams also told him her knee is not as strong as it used to be and "it does give out." (Ex. 5 at 8.) Mr. Arnold believed her and stated he does not believe she is 100 percent because of her knee. Lastly, Mr. Arnold confirmed that Ms. Williams has not missed any days due to her

leg. She works full-duty without restrictions including overtime.

### d. Mr. McMinn

Mr. McMinn confirmed Mr. Adams' testimony concerning the doors. He stated Ceco makes heavier doors now and everyone requires help. He further testified Ms. Williams has not requested additional treatment for her injury. He is also unaware of any job she cannot do. He confirmed he noticed her having difficulty shortly after surgery while on light-duty; however, he is unaware of any difficulties since her release to full-duty. Mr. McMinn acknowledged that Mr. Adams knows Ms. Williams best and how she is able to perform her job. He further stated that, while he might see Ms. Williams around the plant each day, he estimated he only sees her working approximately three times per week.

## Findings of Fact and Conclusions of Law

Ms. Williams has the burden of proof on all essential elements of her claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2016). In analyzing whether Ms. Williams has met her burden, the Court will not construe the law remedially or liberally in her favor, but instead must construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither Ms. Williams nor Ceco. *See* Tenn. Code Ann. § 50-6-116.

### Compensability and Medical Benefits

The parties stipulated that Ms. Williams' injury arose primarily out of and in the course and scope of her employment. Therefore, the only issues the Court must address are the extent of permanent partial disability and Ms. Williams' entitlement to discretionary costs.

As this is a compensable claim, the Court holds Ms. Williams is entitled to reasonably necessary future medical treatment recommended by her authorized treating physician, Dr. Haltom, under Tennessee Code Annotated section 50-6-204.

### Extent of disability

To determine the extent of Ms. Williams' permanent partial disability, the Court must weigh the competing physicians' impairment opinions. As noted, Dr. Haltom assessed two-percent permanent medical impairment to the whole person. Dr. Chung,

using the same reference, assessed six-percent permanent medical impairment to the whole person. Subject to rebuttal by a preponderance of the evidence, Dr. Haltom's impairment rating is presumed correct. Tenn. Code Ann. § 50-6-204(k)(7).

In analyzing the conflicting medical opinions, the Court may consider the experts' qualifications, the circumstances of their examination, the information available to them, and evaluation of that information through other experts. *Brees v. Escape Day Spa & Salon*, 2015 TN Wrk. Comp App. Bd. LEXIS 5 (March 12, 2015). Applying the first factor, the Court finds both physicians are board-certified in their respective fields. Dr. Haltom is a board-certified orthopedist, and Dr. Chung is board-certified in physical medicine and rehabilitation and independent medical evaluations. Both physicians are well-qualified, and the differences in their qualifications are not determinative.

Regarding the circumstances of the evaluation, the Court finds Dr. Haltom's records and testimony demonstrated a thorough examination and treatment of Ms. Williams. Dr. Chung also performed a thorough review and examination of Ms. Williams during his evaluation and reviewed Dr. Haltom's records and operative report. The circumstances of evaluation is likewise not determinative.

The Court therefore turns to the physicians' testimony regarding the competing ratings and their conclusions, as well as the lay proof, to analyze whether Ms. Williams successfully rebutted the statutory presumption afforded Dr. Haltom's rating by a preponderance of the evidence. For the following reasons, the Court finds she did.

In so finding, the Court notes the physicians agreed the appropriate diagnosis was "patellar subluxation or dislocation" found in Table 16-3. The AMA Guides provide that once the physician establishes the appropriate diagnosis to be rated, the next step is to use the regional grid to determine the associated class. The AMA Guides further provide on page 500, "In some cases, the class will be defined by physical examination findings or clinical studies results." After the physician designates the appropriate class, then he can apply the grade modifiers to determine the rating. Here, the primary distinction between the two ratings is that, based on their physical exams, Dr. Haltom placed Ms. Williams in Class 1 for mild instability and Dr. Chung placed her Class 2 for moderate instability.

The Court notes Dr. Haltom last saw Ms. Williams on November 4, 2015, and he chose the class for "mild instability" based on his physical examination that day, her ongoing symptoms, and her last physical therapy report of September 22. At that time, Ms. Williams complained of continued mild weakness, particularly with steps, and a mild ache-type pain. However, Dr. Haltom's exam indicated her patella was tracking well and she had excellent patellar instability with lateral patellar translation at thirty degrees flexion.

Upon learning of Ms. Williams' significant ongoing symptoms, Dr. Haltom

7

declined to move Ms. Williams' impairment class from mild to moderate because he did not find any patellar instability at the last visit or in the last PT note. When Ms. Williams' counsel pointed out that Class 1 *also* requires a finding of instability, Dr. Haltom responded, "Correct." Ms. Williams' counsel argued, and the Court agrees, that it appears inconsistent for Dr. Haltom to deny Ms. Williams had ongoing instability when he also rated her in a class requiring a finding of "mild instability."

Dr. Haltom further stated that Ms. Williams' current symptoms might increase her impairment rating based on the grade modifiers within Class 1, but he could not accurately assess any impairment without examining her again. In other words, Dr. Haltom ackowledged Ms. Williams' impairment may be greater now based on her reported symptoms.

Turning to Dr. Chung's testimony, the Court notes Ms. Williams saw Dr. Chung approximately eight months after her release from Dr. Haltom and after working full-duty at Ceco. Dr. Chung evaluated Ms. Williams and chose the class for "moderate instability," based on his physical exam findings of patellar grinding, moderate instability in lateral movement of patella tracking, visible atrophy, and weakness of the extensors and flexors. Ceco challenged Dr. Chung's rating, in part, because he did not measure the atrophy in Ms. Williams' leg and based his atrophy finding on his visual observation of her left leg compared to the right leg. However, the Court finds Dr. Chung's testimony indicated his atrophy finding was not the primary basis for his designation of moderate instability. Moreover, Dr. Haltom noted some mild atrophy on several visits during Ms. Williams' treatment, and he testified that atrophy can be progressive with nonuse.

Ceco further questioned Dr. Chung regarding the subjective nature of some of the exam testing; however, Dr. Chung stood by his findings, stating the physical exam was objective and his findings were reliable. While Ceco argued that Dr. Chung's exam was flawed or unreliable, the Court finds there was no expert testimony from Dr. Haltom to dispute the accuracy or reliability of Dr. Chung's examination. Rather, Dr. Haltom accounted for the difference in ratings by stating his rating is based on her last visit in November 2015. He acknowledged that he has no knowledge of how she is doing now.

Significantly, the Court finds Ms. Williams was a straightforward, credible witness at trial. She appeared calm, at ease, self-assured, steady, confident, forthcoming, reasonable, and honest. These characteristics, according to the Tennessee Supreme Court, are indicia of reliability. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014). Ms. Williams credibly testified she did not have as many problems with her knee "buckling" or "giving way" when she treated with Dr. Haltom or participated in physical therapy because she was performing sedentary work on light-duty with no forklift work. After she returned to her full-duty work, which included climbing up and down a forklift over 100 times per day, she experienced weakness in her left leg and felt her leg "buckling" or "giving way" on a monthly basis. She described pain in her knee with certain activities

and difficulty stacking the heavy doors.

Ms. Williams' testimony was supported by the uncontroverted testimony of her lead person, Mr. Adams, and her supervisor, Mr. Arnold. Both Mr. Adams and Mr. Arnold worked with Ms. Williams for many years and testified she is an honest and good employee.

While Mr. McMinn, the Safety Manager, testified he was unaware of any problems Ms. Williams experienced at work after she returned to full-duty, the Court notes he only observed her working approximately three times per week and he acknowledged Mr. Adams knows her best since he works with her daily. Mr. McMinn further testified that Ms. Williams works full-duty and ten to fifteen hours of overtime per week. No one disputes that Ms. Williams is a hard worker, but the Court notes Ms. Williams clarified that she works mandatory overtime each week not voluntary. Further, the Court cannot discount the credible testimony of Ms. Williams, Mr. Adams and Mr. Arnold because Ms. Williams continues to work full-duty and overtime to maintain her job.

Accordingly, upon thorough consideration of the preponderance of the evidence, the Court holds Ms. Williams rebutted the presumption of correctness of Dr. Haltom's rating and sets the impairment rating at six percent to the whole person. The Workers' Compensation Law provides that permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 506-207(3)(A). Because Ms. Williams returned to employment at the same or greater wage during her initial compensation period, she is limited to these benefits and not entitled to any enhancement factors. It follows that Ms. Williams sustained six-percent permanent partial disability or a period of twenty-seven weeks. At her stipulated compensation rate of $638.81, the Court concludes Ms. Williams is entitled to permanent partial disability benefits totaling $17,247.87.

*Discretionary Costs and Attorney's Fees*

Ms. Williams filed a Motion to Assess Discretionary Costs. Ms. Williams requested discretionary costs totaling $1,372.00 representing the following itemized costs:

1. Deposition of Dr. Samuel Chung        $750.00
2. Plaintiff's deposition transcript        $113.00
3. West TN Court Reporters (Employer's deposition fee) $213.35
4. Dr. Chung's deposition transcript        $214.65
5. Dr. Haltom's deposition transcript        $81.00

9

Ms. Williams argued that these expenses are accurate, reasonable, and necessary in the preparation for trial and are recoverable costs pursuant to Tennessee Rules of Civil Procedure 54.02(2) and 59.01.

The Workers' Comepnsation Law allows the Court to award discretionary costs for these expenses as reasonable expert deposition fees. Tenn. Code Ann. § 50-6-239(c) (2016). Additionally, Tennessee Rule of Civil Procedure 54.04(2) provides for the recovery of certain discretionary costs. *See also Garassino v. Western Express* 2016 TN Wrk Comp App Bd LEXIS 82, at *12 (Nov. 7, 2016)

Here, Ms. Williams requests recovery of Dr. Chung's deposition fee and court-reporter fees for a copy of her discovery deposition, along with the deposition transcripts of Dr. Chung, Dr. Haltom, and employer's deposition. The Court holds $1,372.00 are recoverable discretionary costs.

The Court further holds Ms. Williams' attorney is entitled to a reasonable attorney's fee for his representation of Ms. Williams. The statute provides attorneys' fees shall be deemed reasonable if the fee "does not exceed twenty percent (20%) of the award to the injured worker." Thus, the Court holds counsel for Ms. Williams is entitled to recover a twenty-percent fee.

**IT IS, THEREFORE, ORDERED** as follows:

1. Ms. Williams shall recover from Ceco Door Products permanent partial disability benefits in the amount of $17,247.87.

2. Ms. Williams shall receive future medical benefits pursuant to statute.

3. Ms. Williams is awarded a total amount of $1,372.00 for discretionary costs.

4. Ms. Williams' attorney is awarded a twenty-percent attorney's fee and any incurred expenses to be paid from Ms. William's award.

5. Absent an appeal of this order by either party, the order shall become final thirty days after issuance.

6. Costs of $150.00 are assessed against Ceco Door Products under to Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016), to be paid within five days of this order becoming final.

**ENTERED this the 3rd day of August, 2017.**

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

## APPENDIX

Stipulated Findings of Fact:

1. Ms. Williams is forty-four years old and a resident of Madison County, Tennessee. She is a high school graduate.
2. She injured her left knee on March 2, 2015, and gave proper notice to Ceco the same day.
3. Ms. Williams received authorized treatment from Dr. Haltom, Dynamix Physical Therapy, and Tennova-Regional Hospital of Jackson.
4. Ceco owes no outstanding temporary disability benefits.
5. Ms. Williams returned to work for Ceco, earning the same or greater wage as she earned at the time of the injury.
6. Ms. Williams' compensation rate is $638.81.
7. Ms. Williams attained maximum medical improvement on November 4, 2015.

Exhibits:

1. Employer's First Report of Work Injury Wage Statement
2. Wage Statement
3. Indexed medical records of Dr. Haltom and Dr. Chung
4. Deposition of Reggie Adams
5. Deposition of Tim Arnold
6. Deposition of Samuel Chung, D.O.
7. Deposition of J. Douglas Haltom, Jr., M.D.
8. Ms. Williams' employment history

Technical record:[3]
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Initial Hearing
4. Amended Petition for Benefit Determination
5. Dispute Certification Notice

---

[3] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

11

6. Joint Pre-Compensation Hearing Statement
7. Employee's Notice of Proposed Witnesses and Exhibits
8. Employee's Trial Brief
9. Motion to Assess Discretionary Costs
10. Employer's and Insurer's Notice of Proposed Witnesses and Exhibits
11. Employer's and Insurer's Pre-Trial Brief
12. Deposition excerpts of Consuelo Williams
13. Employer's and Insurer's Response in Objection to Employee's Motion to Assess Discretionary Costs

Marked for ID Purposes:
1. Two settlement offer letters from Travelers to Ms. Williams

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 3rd day of August, 2017.

| Name | Via Email | Service sent to: |
|------|-----------|------------------|
| David Hardee, Esq., | X | dhardee@hmdlaw1.com |
| Employee's Counsel | X | kperry@hmdlaw1.com |
| J. V. Thompson, Esq., | | jthompson@raineykizer.com |
| Employer's Counsel | X | cjohnson@raineykizer.com |

Penny Shrum, Clerk of Court
**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**